**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JAMES NEWTON,           )
                                )
                Plaintiff,    )
                                )      **MEMORANDUM OPINION**
     v.                     )     **AND RECOMMENDATION**
                                )
MICHAEL J. ASTRUE,      )        1:08CV305
Commissioner of Social Security,  )
                                )
               Defendant.  )

       Plaintiff, James Newton, brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

**Procedural History**

       Plaintiff filed an application for SSI on September 15, 2003 (protective filing date, August 25, 2003), with an alleged onset of disability (AOD) of June 15, 2003. Tr. 47; <u>see also</u> Tr. 33. The application was denied initially and upon reconsideration. Tr. 28, 32. Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ). Tr. 34. Present at the hearing, held on July 9, 2007, were Plaintiff, his attorney, a medical expert, and a vocational expert (VE). Tr. 314.

By decision dated September 4, 2007, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  Tr. 13.  On February 28, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, Tr. 5, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.    The claimant has not engaged in substantial gainful activity since August 25, 2003, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> 2.    The claimant has the following severe impairments:  an affective disorder; a personality disorder; a polysubstance abuse disorder; and hepatitis C infection (20 CFR 416.920(c)).

Tr. 15.  He continued:

> 3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
> . . .
>
> 4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a wide range of light, unskilled work.

Tr. 16.  The ALJ determined that Plaintiff was unable to perform his past relevant work.  Tr. 21 (citing 20 C.F.R. § 416.965).

Plaintiff, born on August 3, 1958, was a "younger individual," as regulatorily defined, during the pendency of his claim.  See Tr. 21 (citing 20 C.F.R. § 416.963).

2

The ALJ found that Plaintiff has at least a high school education and can communicate in English. He added that transferability of job skills was not an issue in the case. Based on these factors, Plaintiff's residual functional capacity, and the VE's testimony, the ALJ concluded that "the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 22. Accordingly, the ALJ decided that Plaintiff was not under a disability, as defined in the Act, from the date he filed his application. Id. (citing 20 C.F.R. § 416.920(g)).

## Analysis

In his brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ erred in (1) his assessment of Plaintiff's treating physician's opinion; (2) his determination of whether Plaintiff met a "Listing"; (3) his formulation of a hypothetical to the VE; and (4) finding that Plaintiff's allegations of functional limitations were not fully credible. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

Scope of Review

The Act provides that, for "eligible"[1] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 1382c(a)(3)(A).[2]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. Section 416.920.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. <u>Richardson v.</u>

---

[1] Eligibility requirements for SSI are found at 42 U.S.C. § 1382(a).

[2] The regulations applying this section are contained in the Code of Federal Regulations (C.F.R.) at Title 20, "Employees' Benefits," and all regulatory references will be thereto.

4

Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Issues

1. Treating Physician's Opinion

Although the regulations require that all medical opinions in a case be considered, Section 416.927(b), treating physician opinions are accorded special status, see Section 416.927(d)(2). "Courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily

examined the applicant and has a treatment relationship with the applicant.'" <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 (4th Cir. 2006) (quoting <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005) (internal citation omitted)). The rule, however, does not mandate that her opinion be given controlling weight. <u>See</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). "It is error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490-01, 34491. <u>See also</u> Section 416.927. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996).

Plaintiff argues that the ALJ erred in his assessment of his treating physician's opinion because the ALJ failed to provide "persuasive contrary evidence" against the opinion, citing <u>Hines</u>: "The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'" 453 F.3d at 563 (quoting <u>Hunter</u>, 993 F.2d at 35). Plaintiff, however, is misinterpreting the quote. Before the ALJ can decide to "give less weight" to the treating physician's opinion, he must first decide if such opinion is due "controlling weight." The regulations provide that, in order to be due controlling weight, the fact finder must first determine that the opinion "is

6

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Section 416.927(d)(2). See also Craig, 76 F.3d at 589 (finding "persuasive contradictory evidence" when the treating physician's opinion was not supported by clinical findings or laboratory test results or even the doctor's "own office notes"). If the opinion does not fill these requirements, it must then be weighed in accordance with other criteria to determine what weight it is due. See Section 416.927(d)(2).

Plaintiff has been seeing psychiatrist Nathan Jackson of the "Caring Family Network"[3] (hereinafter, "the Clinic") since 1995, mostly going months, and sometimes even years, between appointments.[4] In March 2003, Plaintiff saw Dr. Jackson for a routine visit, stating that his mood had been "pretty good." Tr. 191. Before he next saw Dr. Jackson on June 4, Plaintiff called the Clinic requesting assistance with alcohol and cocaine relapse. Id. He then underwent detoxification and, next, hospitalization for rehabilitation. See Tr. 111. Plaintiff's principal and primary diagnosis was alcohol dependence. Tr. 114.

Plaintiff had not seen Dr. Jackson again when, not three months later, law enforcement personnel brought him to the emergency room. Tr. 117. Plaintiff recounted that he had been drinking for two weeks straight, had used cocaine and

---

[3] The "Caring Family Network" is apparently a division of the North Carolina Division of Mental Health, Developmental Disabilities, Substance Abuse Services. See Tr. 261.

[4] When Plaintiff saw Dr. Jackson in March 2002, the doctor observed, "this is the first time I've seen [Plaintiff] since September 1999." Tr. 196.

marijuana two days prior, and had drunk a fifth of alcohol that day. His family said that he had been violent and had made verbal threats to them. A urinalysis was positive for both street drugs. Tr. 118.

Plaintiff again underwent substance abuse treatment. See Tr. 124. He said that he experienced increased irritability and damaged property when intoxicated. Plaintiff confessed that he felt depressed when drinking. He denied using marijuana. Tr. 125. Plaintiff's principal diagnosis was alcohol dependence, Tr. 129; there was no mention of a personality disorder.

Plaintiff did not see Dr. Jackson until November 13, 2003, see Tr. 186 – his first visit since March and two hospitalizations. Plaintiff apparently had been abstinent since his September 5th discharge from treatment. See Tr. 130. He told Dr. Jackson about his recent drinking, but there is no mention of his drug use. Tr. 186. Plaintiff also reported being involved in a violent altercation with his girlfriend, pursuant to which he was facing criminal charges. Plaintiff told the doctor that his mood was good, and Dr. Jackson described Plaintiff as "friendly." Id. He diagnosed Plaintiff with alcohol dependence in early remission; social phobia; major depression in partial remission; insomnia, possibly related to depression and anxiety; and cocaine dependence *in sustained full remission*.

Plaintiff next saw Dr. Jackson on January 12, 2004, reporting that his holidays had been better without drinking and drugs, and that he had been abstinent since his last visit. Tr. 185. When Plaintiff discussed his problem with mood swings, he

8

said that his good mood can suddenly turn to depression; he did not report any violence or altercations. Again, Dr. Jackson said that Plaintiff was friendly, and Plaintiff reported his mood as "pretty good." Id.

Yet three and a half weeks later, Plaintiff again sought inpatient treatment, stating that he had been drinking, everyday, for *six weeks*. Tr. 184. He had used crack cocaine the previous weekend. While admitted, Plaintiff said that he had been abstinent since June 2003, Tr. 133, despite his involuntary commitment the following August. He had relapsed *two months* previously, presumably before the "holidays" and his January visit with Dr. Jackson. He also said that he had not used marijuana in years, despite his positive urinalysis in August. Cf. Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (the ALJ may discount subjective complaints based on credibility determinations). Plaintiff said that he enjoyed being with his girlfriend and had hobbies, particularly enjoying wood-burning. Tr. 133-34.

Even upon admission, Plaintiff's mental status examination was positive. The doctor described him as friendly and cooperative. Tr. 134. Plaintiff exhibited no problems with his memory, concentration, or attention, and was able to perform serial sevens. Plaintiff's records reveal that "[h]e did not have any major interpersonal difficulties or problem," and at discharge, he was not depressed. Tr. 135. Plaintiff's principal diagnosis was alcohol dependence, severe, with physiologic dependence; again, there was no mention of a personality disorder. His

9

Global Assessment of Functioning ("GAF") upon admission was forty-five but, at discharge, it was seventy.[5]  Tr. 136.

Plaintiff returned to see Dr. Jackson on March 24, 2004.  See Tr. 182.  Plaintiff shared that he was attending both Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings, had gone to a dance, and planned to go to a convention. Tr. 182.  The doctor observed that both Plaintiff's mood and affect were "good," and Plaintiff "conversed in a friendly, sincere manner."  Id.  He was to return in two months, but he did not.

In the meantime, Plaintiff attended a psychiatric consultative examination.  See Tr. 153.  He told the psychologist, Jim Miller, that he was still drinking and, *when he is drinking*, "he becomes quite angry and aggressive."  Tr. 153-54.  Dr. Miller, however, found Plaintiff to be polite.  The doctor diagnosed Plaintiff with alcohol dependence.  Tr. 155.  He opined that, when drinking, Plaintiff would have difficulty relating to co-workers and supervisors, and might have difficulty tolerating the stress and pressures of everyday work activity.

---

[5]    A GAF score represents a clinician's judgment of an individual's overall level of functioning.  American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000) [hereinafter, the "DSM-IV"].  The GAF scale considers psychological, social and occupational functioning of mental health on a scale of 0-100.  Id. at 33-34.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  Lower GAF scores signify more serious symptoms. A score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id. at 34.  Scores in the range of 61-70 indicate "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning."  Id.

10

When Plaintiff went back on June 15, 2004, Dr. Jackson found him "at baseline." Tr. 181. Plaintiff found his medications to be "helpful . . . *mainly with irritability*." Id. (emphasis added). See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act). He continued to attend AA and NA meetings, feeling "supported by group members." Tr. 181. The doctor wrote a letter on Plaintiff's behalf, "detailing the work related consequences *of his chronic depression*." Id. (emphasis added).

Although not in his records of at least the previous five years, Dr. Jackson wrote about Plaintiff's difficulty with work relationships, low frustration tolerance, and angry outbursts, blaming them on Plaintiff's depression and not on a personality disorder. Interestingly, Dr. Jackson was moved to offer a differing opinion to Vocational Rehabilitation ("VR"), albeit "with some reservation," when it called seeking confirmation that Plaintiff was "a candidate for employment." Tr. 180.

Plaintiff returned in August 2004, saying that he was "doing pretty well." Tr. 179. He had no serious depression and repeated that his medications were helping. Plaintiff told Dr. Jackson (despite his statements to Dr. Miller) that he had used neither alcohol nor drugs since February 2004. Dr. Jackson described Plaintiff's mood and affect as good, and opined that his depression was in "partial remission." Id.

11

Plaintiff missed his appointment in September 2004, prompting Dr. Jackson to explain that Plaintiff has a history of "intermittent involvement in treatment." Tr. 178. In December, VR called to report that Plaintiff had missed his appointment there and had not gotten required labwork, so it was closing his case. Cf. Simila v. Astrue, 573 F.3d 503, 520 (7th Cir. 2009) (finding that a failure to participate in a vocational rehabilitation program both showed a lack of effort to find work and diminished claimant's credibility); Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996) ("The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment.").

Plaintiff's missed VR appointment was explained in his next telephone call to the Clinic, seeking detoxification and rehabilitation. See Tr. 177. Plaintiff stated that he had been drinking more than a case of beer a day since he relapsed on Thanksgiving. He was also drinking liquor, if available, and smoking crack cocaine. He was *not* taking his prescribed medications.

Plaintiff's caregiver[6] at the rehabilitation center found him to be "quite pleasant and cooperative" and that he "related well to the situation." Tr. 300. He exhibited no memory problems and was able to follow instructions. Tr. 299. Plaintiff explained that he was taking Effexor for "treatment of anxiety." Id. He attended group sessions, Tr. 301, and there was no note of interpersonal difficulties. On discharge,

---

[6]   The doctor noted that Plaintiff had last been admitted in November 2004, Tr. 299; this admission is not mentioned elsewhere in the record.

his mood, sleep, energy, and appetite were good. Plaintiff's principal and primary diagnosis was cocaine dependence, with additional diagnoses of alcohol dependence and a *history* of personality disorder, not otherwise specified. His GAF upon admission was forty, but on discharge, sixty.[7]  Tr. 302.

When Plaintiff finally returned in March 2005, he had last seen Dr. Jackson in August of the previous year, for a total of just six visits over two years. Plaintiff reported that he was taking care of his mother and handling the cooking, cleaning, and shopping. Tr. 304. Since his discharge, he had been "very active in AA and NA" – Plaintiff had even designed and printed brochures. Id. Plaintiff felt that he was "doing fairly well" with his mood, with no sustained depression and "pretty good" motivation." Id. Dr. Jackson recorded Plaintiff's mood as "pretty good," with a euthymic affect, and noted that Plaintiff "engaged in a friendly manner." Id. The doctor's record of Plaintiff's visit two months later reads pretty much the same. See Tr. 303. Plaintiff was to follow-up in another two months.

Plaintiff attended a second psychiatric consultative exam in June 2005, and its mental status exam is markedly similar to those of Dr. Jackson and others. The examiner, Loretta Braxton, Ph.D., found Plaintiff to be polite and cooperative, and his mood and affect to be unremarkable. Tr. 211. Plaintiff showed appropriate

---

[7]   A GAF of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  DSM-IV, at 34.  A GAF score of 51-60 indicates only "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning."  Id.

emotional expression, and no agitation or aggression.  His memory was good.  Yet he told the examiner that he lost his last job because he could not get along with his supervisor, and that he was recently jailed after "an angry outburst."[8]  Tr. 210.

Plaintiff said that he was taking medication "to help with his explosive outbursts."  Id.  Dr. Jackson, however, explained that Effexor was to treat Plaintiff's depression, mood swings, and social anxiety, see, e.g., Tr. 186, 258, and Plaintiff told the rehabilitation center that it was for anxiety, Tr. 299.  Based on Plaintiff's account to Dr. Braxton – which includes information apparently first disclosed here – she diagnosed alcohol and cocaine dependence, but also rule-out personality disorder, not otherwise specified.  Tr. 212.  When Plaintiff attended a physical consultative exam two months later, he told the doctor that he had "severe mood swings," for which he took medication.  Tr. 214.  But the medication helped and, currently, he was neither violent nor angry.[9]

Again, a significant period elapsed between Plaintiff's May 2005 visit with Dr. Jackson and the next one and, indeed, Plaintiff has no treatment records of any kind for a year.  In May 2006, Plaintiff explained to Dr. Jackson that he had just finished three months in jail, but he did not say why.  Tr. 258.  Plaintiff reported that he had

---

[8]    Plaintiff does not date this episode, so it is unknown whether he was then involved in substance abuse.  There is no mention of it in Dr. Jackson's records.

[9]    Although Plaintiff told both Drs. Jackson and Braxton that he spent his time doing housework and caring for his mother, Tr. 211, 303, he told the physical examiner that he did *no* housework, see Tr. 215.

14

been abstinent only since he had gotten out of jail. He also told the doctor that Effexor was still effective for his depression and mood swings, and that he continued to care for his mother and attend meetings. Dr. Jackson wrote: "*As usual*, his manner is friendly. Mood reported as pretty good. Affect seems euthymic." <u>Id.</u> (emphasis added).

When Plaintiff returned in July 2006, he told Dr. Jackson that he had been arrested for trespassing, but did not describe an altercation. Tr. 257. Before this incident, his mood had been good, but Dr. Jackson found Plaintiff serious and frustrated although not hopeless, nor did he note anger. The doctor revised Plaintiff's diagnoses – for the first time in almost two years – to depression, insomnia, social phobia (stable), and alcohol dependence, but *not* personality disorder.

The following episode, though disputed by Plaintiff, was recorded by hospital personnel. Three days after his visit with Dr. Jackson, Plaintiff presented to the emergency room with chest pain. Tr. 297. He had also "got into a scuffle with his brother." <u>Id.</u> Plaintiff admitted to social alcohol use – "'Till I pass out'" – and that he had last used cocaine "Monday." Tr. 291. The previous Monday would have been the day before he met with Dr. Jackson. A toxicology screen performed on Plaintiff's

15

blood drawn twenty-four hours after his admission revealed the presence of alcohol.[10]  Tr. 268.

His attending physician, Robert Foster, wrote that Plaintiff "was smoking cocaine when he developed chest pain."  Tr. 295.  Dr. Foster added, "He binge drinks, says he spends how much money there is around."  Id.  The doctor's diagnoses included both cocaine and alcohol abuse.  Tr. 296.  Upon Plaintiff's discharge, Dr. Foster expanded:

> He had been smoking some cocaine apparently before this happened. He declined counseling for cocaine use, saying that he can take it or leave it, but some friends came over and offered it.  He does not feel like it is a problem.  He says he can stop it if he needs to.

Tr. 297.

Despite his reported stress – about hospital bills and the trespassing charge – Plaintiff's appearance was good and his speech normal when he next saw Dr. Jackson, in September 2006.  Tr. 256.  Dr. Jackson diagnosed depression and *status-post* substance abuse.

Plaintiff returned, as scheduled, in December 2006.  He reported that he continued caring for his mother, cooking and cleaning, including "cook[ing] a big Thanksgiving dinner for all the family."  Tr. 254. But as his mother was deteriorating, and he was contemplating homelessness, he rated his depression as "medium."  Id.

---

[10]  "We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking, as the body functions to eliminate it from the system."  United States v. Reid, 929 F.2d 990, 993 (4th Cir. 1991) (quoting Schmerber v. California, 384 U.S. 757, 770 (1966)).

Dr. Jackson observed that Plaintiff was "at baseline," with a mood reported as "worried but otherwise okay." Id. Although his affect was mildly depressed and pre-occupied, Plaintiff was still "able to interact in a friendly manner," even being humorous. Id. Dr. Jackson again changed Plaintiff's diagnoses, to major depression, but in partial remission; insomnia; social phobia; alcohol dependence, in remission since February 2005. He noted that Plaintiff's cocaine abuse had occurred "some years ago," id., although Plaintiff does not dispute that he used cocaine in January 2005, see Tr. 177, 336.

In 2007, Plaintiff went to his regularly-scheduled appointments in March and June – his last medical visits in the record. Although he continued to take care of things at home, his dog had been killed, and his mood was up and down. Tr. 252-53. Dr. Jackson described Plaintiff as at baseline, and his affect showed mild underlying depression. Tr. 252-53.

The following month, Dr. Jackson wrote a letter on Plaintiff's behalf, which mirrors his letter of three years earlier, compare Tr. 175 with Tr. 310:

> [Plaintiff's] depression causes him diminished motivation and energy, making him unable to keep a regular work schedule. It has caused impaired concentration, making him incapable of performing routine work requirements consistently. It has caused him irritability, causing him difficulty maintaining [routine] work relationships, and low frustration tolerance, causing angry outburst[s] at routine work requirement[s].

Tr. 310. He also completed a "Medical Source Statement" (hereinafter, "MSS") on Plaintiff's behalf. See Tr. 305-09. Dr. Jackson's diagnoses are consistent with his

17

records: major depression, partial remission; social phobia; alcoholism; and chronic insomnia. Tr. 305. Some of the symptoms listed were also consonant: sleep disturbance, mood disturbance, emotional lability, substance dependence-in remission; social withdrawal or isolation; social anxiety; and *mild* irritability. Tr. 305-06.

For the first time, however, Dr. Jackson disclosed that he suspected that Plaintiff had suffered a loss of intellectual ability of at least fifteen IQ points, and that Plaintiff had insecurity, low self-esteem, and difficulty thinking or concentrating. Tr. 305. The doctor further opined that Plaintiff had marked difficulties in maintaining social functioning; constant deficiencies of concentration, persistence or pace; and continual episodes of deterioration or decompensation. Tr. 308. Nevertheless, Dr. Jackson believed that Plaintiff's impairments would "[n]ever" cause him to be absent from work. Tr. 306.

The ALJ first acknowledged, as Plaintiff argues, that "the opinion of a treating physician is entitled to great weight and may be disregarded only if there is persuasive contradictory evidence." Tr. 20 (citing <u>Coffman v. Bowen</u>, 829 F.2d 514 (4th Cir. 1987)). The ALJ, however, found Dr. Jackson's opinions not to be supported by even his own clinical findings. As the ALJ noted, Tr. 16, although Plaintiff has a history of mood swings, Dr. Jackson consistently found him to be friendly, <u>see</u> Tr. 258 ("As usual his manner is friendly."); <u>see also</u> Tr. 186, 196, 304. Plaintiff told Dr. Jackson that he had no problem with concentration, Tr. 194, and Dr.

18

Jackson made no notations as to Plaintiff's memory or attention.  On the other hand, Plaintiff's mental status testing revealed no problems with memory, concentration, or attention.  Tr. 134.  Dr. Jackson often wrote that Plaintiff's thoughts were "goal directed."  See, e.g., Tr. 254, 257, 258.

Despite the doctor's finding of "marked" difficulty with social functioning, Plaintiff regularly attended NA and AA meetings after his substance abuse treatments, feeling "supported by group members."  Tr. 181.  After his February 2004 hospitalization, Plaintiff said that he was attending meetings, had gone to a dance, and planned to go to the convention.  Tr. 182.  After his February 2005 treatment, Plaintiff was "very active" in the organizations.  Tr. 304.  In May 2006, Plaintiff was "active in recovery," attending meetings.  Tr. 258.

The court wonders at Dr. Jackson's basis for his opinion that Plaintiff *continually* experiences "[e]pisodes of deterioration or decompensation[11] in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)," Tr. 308 (footnote added); Plaintiff has pointed to none.  The record clearly supports the ALJ's finding that Plaintiff "has experienced no episodes

---

[11]  SSA defines "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App. 1 (pt. A), § 12.00C.4.

of decompensation absent use of alcohol and drugs.'"[12]   Tr. 16.   After Plaintiff's treatment in February 2005, he often reported that he was attending meetings and taking care of his mother and of their home.   See, e.g., Tr. 254, 258, 303, 304. Plaintiff's sister blamed his "outbursts" and fighting on substance abuse.   See Tr. 70. Even Plaintiff stated that he experienced increased irritability, aggressiveness, and anger when intoxicated.   Tr. 124, 153-54.

As "persuasive contradictory evidence," the ALJ pointed to the rest of the records, including reports from the consultative examiners and VR.[13]  One examiner found Plaintiff to be polite and cooperative, Tr. 211, and another, polite and well-motivated, Tr. 153.   The ALJ noted, Tr. 16, that upon testing, Plaintiff exhibited some impairment of visual memory, see Tr. 152, but examinations generally revealed no problems with memory, attention, concentration, or functioning, see, e.g., Tr. 117, 154, 211, 300.   The VR reports described Plaintiff as an "excellent" employee, who was "quiet and hard-working," followed directions well, Tr. 95, and was "polite and respectful to all employees and supervisors," Tr. 96.

In addition, the state agency's field officer observed that Plaintiff had no difficulty with concentration or understanding, and was cooperative and pleasant.

---

[12]   As the ALJ explained:  "[S]ection 1614(a)(3)(J) of the [Act] provides that individuals whose drug addiction and/or alcoholism is a contributing factor material to the determination of their disability are [not] eligible for disability payments."  Tr. 20.

[13]   The ALJ also relied upon the medical expert's testimony, but as this testimony, in the reading, is less than clear, the court will not address Plaintiff's many objections to it, as the referenced reports constitute substantial evidence to support the ALJ's decision.

Tr. 59.  Plaintiff told a state agency worker that he attended AA meetings "every night."  Tr. 71.  Plaintiff was found to be friendly and cooperative.  Tr. 134.

Dr. Jackson's records also do not support the statements in his letter.  Plaintiff credited *working* for his good mood and *lack* of problems with energy, motivation, and irritability.  Tr. 192.  After seven to eight months on the job, Plaintiff said that he felt "fairly comfortable there" and his mood had been "pretty good."  Tr. 191.  Dr. Jackson's records contain only two mentions of frustration:  noting, after a phone call before Plaintiff's AOD, that he had a "*history* of . . . low frustration tolerance."  Tr. 194 (emphasis added); and the other is that Plaintiff's affect was "frustrated" after he was, unjustifiably in his view, arrested for trespassing.  Tr. 257.  Other than this incident, Plaintiff's "interpersonal conflicts" were associated with substance abuse, see Tr. 65, 117, 297, except for one where substance abuse was yet a possibility, see Tr. 186.

On the other hand, Dr. Miller opined that Plaintiff, *absent substance abuse,* would be "able to understand, retain, and follow simple instructions, and to sustain attention in order to perform a simple, repetitive task."  Tr. 155.  He believed that, if drinking, Plaintiff "would have some difficulty relating to fellow workers and supervisors," and "might have some difficulty tolerating the stress and pressures associated with day to day work activity."  Id.

Unlike his interview with Dr. Miller, Plaintiff related to Dr. Braxton "a long history of . . . poor interpersonal relations with family, friends, and coworkers," "a

21

history of multiple incarcerations," and stories of "angry" and "explosive" behavior. Tr. 210. Yet Dr. Braxton believed that Plaintiff, when abstinent, would be able to maintain concentration, persistence, and pace, and to perform simple, routine, repetitive tasks ("SRRTs"). Tr. 212. She averred, however, that Plaintiff "would likely have significant problems" with his peers, coworkers, and supervisors "due to his long history of poor emotional regulation." Id. Two state experts opined that Plaintiff would be able to perform SRRTs, Tr. 173, 243, although one (after Plaintiff's interview with Dr. Braxton) suggested "a setting [with] minimal interpersonal demands," Tr. 243.

Plaintiff contends that the ALJ does not explain *why* he does not favor Dr. Jackson's opinion, but he does: Dr. Jackson's opinions are not supported by his own records and is contradicted by the other evidence of record. Because the court has read the record, as it is expected to, it is aware of the ways that Dr. Jackson's records conflict with his opinion. After all, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). In any event, the court will not set aside an administrative finding based on an arguable deficiency in opinion-writing technique when it is unlikely to have affected the outcome. Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999). See also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case

in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Reddy v. Commodity Futures Trading Comm'n, 191 F.3d 109, 125-26 (2d Cir. 1999) (a reviewing court will not be "'disposed to overturn a sound decision if the agency's path, although not ideally clear, may reasonably be discerned.'" (citation omitted)).

Plaintiff complains of the ALJ's reliance on the other opinions because they pre-date his "period . . . of prolonged and uninterrupted freedom from alcohol or cocaine dependence." Pl.'s Br. at 10. Yet the consulting examiners and the state agency experts gave an opinion as to Plaintiff's abilities both *with* and *without* substance abuse. And, significantly, Dr. Jackson attributed Plaintiff's difficulties to his depression. Further, Plaintiff did say that he felt depressed *when drinking*. Tr. 214. Plaintiff told Dr. Jackson and others that his medications helped his symptoms, see, e.g., Tr. 179, 181, 214, 258, and there is no evidence that Plaintiff was non-compliant with his medications *except* when abusing substances, see Tr. 177.

Plaintiff appears to give the most credence to Dr. Braxton's opinion, focusing on her statement that Plaintiff "would likely have significant problems with his peers and co-workers and with responding appropriately to supervision due to his long history of poor emotional regulation." Tr. 212. Yet, in response to this opinion, the state agency expert only limited Plaintiff to a setting with minimal interpersonal

23

demands,[14] Tr. 243, which prompted the ALJ's restriction "requiring minimal interaction with others," Tr. 17. As SSA regards the experts as "highly qualified . . . psychologists who are experts in the evaluation of the medical issues in disability claims under the Act," SSR 96-6p, 61 Fed. Reg. 34466-01, 34467, the court finds their opinions provide substantial evidence to support the ALJ's opinion, especially as the treating physician's opinion is unsupported. See Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986) (affirming that "the testimony of a non-examining physician can be relied upon when it is consistent with the record" (citing Kyle v. Cohen, 449 F.2d 489, 492 (4th Cir. 1971)).

2. Listing 12.04

Plaintiff insists that, based on Dr. Jackson's findings in the MSS, he meets Listing 12.04. The "Listings," found at 20 C.F.R. part 404, subpart P, Appendix 1, "is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). When a claimant satisfies a Listing by meeting all its specified medical criteria, he presumably qualifies for benefits. See id.

In performing the Listings analysis at step three, the ALJ found that Plaintiff suffered from severe impairments listed in three of the nine diagnostic categories

---

[14] Plaintiff argues that "Dr. Charles" offered opinions which correspond to Dr. Jackson's, but Dr. Charles is the state expert who opined that Plaintiff could work in a setting with minimal interpersonal demands.

grouped under Listing 12.00, "Mental Disorders." <u>See</u> Tr. 16. Listings 12.04 and 12.08 consist first of a descriptive passage, and then a set of medical findings (paragraph A criteria), one of which must be met.[15] <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 (part A) [hereinafter cited as "The Listings"], § 12.00A. If this criterion is met, there follows a test of functional limitations (paragraph B criteria), *two* of which must be met. There is an additional functional criterion (paragraph C criteria) in Listing 12.04, which will be assessed only if the paragraph B criteria are not satisfied.

The ALJ did not discuss Plaintiff's meeting of the paragraph A criteria, but moved on to the B criteria, concluding that Plaintiff's mental disorders resulted in:

(1) mild restriction in activities of daily living;

(2) moderate difficulties in maintaining social functioning;

(3) moderate difficulties with regard to concentration, persistence, or pace; and

(4) no episodes of decompensation, absent substance use.

---

[15] The structure of the listing for substance addiction disorders, 12.09, is also different from that for the other mental disorder listings. Listing 12.09 is structured as a reference listing; that is, it will only serve to indicate which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances.

The Listings, § 12.00A.

Tr. 16.  The ALJ further found that the record failed to establish the Listing 12.04C criteria of "a residual disease process resulting in marginal adjustment, inability to function outside a highly supportive living arrangement, or complete inability to function dependently outside the home."  Tr. 16.

In his argument, Plaintiff relies on Dr. Jackson's opinion that he has marked difficulties in maintaining social functioning; constant deficiencies in concentration, persistence, or pace; and continual episodes of deterioration or decompensation. Tr. 308.  Plaintiff's premise, of course, is only as valid as Dr. Jackson's opinion.  But the court has found the ALJ's decision to discount the doctor's opinion to be supported by substantial evidence; thus, Plaintiff's claim fails.

3.  Hypothetical

Plaintiff next argues that the ALJ's hypothetical was faulty because it did not include all of his mental impairments.  For a VE's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments.  Johnson, 434 F.3d at 659 (citing Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989)).  See also English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993). But the hypothetical posed to the VE need only reflect those impairments supported by the record.  See Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000); Cass v. Shalala, 8 F.3d 552, 556 (7th Cir. 1993).

26

Plaintiff points to Dr. Jackson's statement that he has "marked" limitation in ability to maintain social functioning but, of course, the ALJ discounted Dr. Jackson's opinion. Plaintiff further relies on the statement of Clifford Charles, Ph.D., that he "would have significant problems with his peers and co workers and responding appropriately to supervision due to his long history of very poor interpersonal relationships." Tr. 240. But this "opinion" is actually taken from a summarization of Dr. Braxton's report, and is not an opinion at all. See Tr. 210 ("He has a long history of . . . poor interpersonal relations[.]"); 212. Plaintiff also refers to a line from the summarization that he "had a very hard time getting along with people and this may cause problems."[16] Tr. 240. To be sure, Dr. Charles's opinion is that Plaintiff's employment be limited to "a setting [with] minimal interpersonal demands," Tr. 243, *not* that Plaintiff was unemployable.

The ALJ's hypothetical claimant is limited to "minimal interaction with others," specifically, "no teamwork," Tr. 350, but Plaintiff claims this criterion is insufficient to "capture the full gravity of [his] impairment," Pl.'s Br. at 12. Plaintiff describes his impairment as an "*inability* to respond to supervision and get along with others," id. (emphasis added), but no doctor – not even Dr. Jackson[17] – so opined. Plaintiff

---

[16]   In his Brief, Plaintiff misquotes this fragment to read, "[T]his may *be a* cause *of his* problems." Pl.'s Br. at 11 (emphases added).

[17]   The MSS provides a range of answers to its severity criteria, from "No/Mild Loss" to "Extreme." Tr. 308. In answering to what degree was Plaintiff limited with "Difficulties in maintaining social functioning," Dr. Jackson answered "Marked" instead of "Extreme," id., (continued...)

claims that he "*is unable* to get along with people who work *independently* from him but in close proximity," id. (citing Tr. 307[18] (emphases added)), and points to his 2006 trespassing incident and fight with his brother.[19]

These incidents, however, do not prove that Plaintiff suffers from a complete inability to work. The hospital records after Plaintiff's "scuffle" with his brother show that he was at least drinking alcohol, see Tr. 268, and Plaintiff has admitted to becoming "quite angry and aggressive" when drinking, Tr. 153-54. In addition, Plaintiff's description of his "trespassing" to Dr. Jackson was quite benign; he explained that he was simply passing through his neighbor's yard when she called the police. Tr. 257.

Further, there is no indication in any of Plaintiff's treatment records that he had interpersonal difficulties when not involved in substance abuse. See, e.g., Tr. 94 (likes people at work); 113 (can "cooperate with staff"); 135 ("He did not have any major interpersonal difficulties or problems."); 181 (feels supported by AA/NA group members). Plaintiff reported that he worked at a textile mill – presumably, *not* isolated – for four years, and that the job ended when the mill was sold. Tr. 126.

---

[17](...continued)
which indicates "[c]omplete loss of ability," Tr. 306.

[18]   Plaintiff here cites to the MSS, but the criterion actually reads: "Work in coordination with or proximity to others without being unduly distracted." Tr. 307. Dr. Jackson opined that Plaintiff only had a "Marked" restriction here, rather than "Extreme." Id.

[19]   Plaintiff continually focuses on the period post-dating February 2005 as proof that he has been abstinent for an extended period, yet Plaintiff did not amend his AOD from June 15, 2003.

28

And Plaintiff himself said that he had trouble only "around *large* groups of people." Tr. 51 (emphasis added).

Plaintiff stated that he "tries not to visit and socialize" because of the temptation to substance abuse, Tr. 153, ("he might get in to (sic) his old habits"). Plaintiff told Dr. Jackson that he had prepared a "big Thanksgiving dinner" for the whole family. Tr. 254. His sister said that Plaintiff had problems getting along with family, friends, and others, but explained, "[A]ny time we get together [he] is drunk." Tr. 65. Plaintiff discussed his attendance at community college, see Tr. 134 (2 degrees), 194 (6 years), and at NA and AA meetings, see, e.g., Tr. 181, 258, 304 ("active in the AA/NA community").

The only evidence in the record from a work-like setting is from VR. A VR "Monthly Progress Report" from November 2002, described Plaintiff as "a reliable worker" who "takes directives well and is polite and respectful to all employees and supervisors." Tr. 96. The December report called Plaintiff an "excellent" employee: quiet, hard-working, taking directives very well.[20] Tr. 95. In February 2003, Plaintiff was again described as an excellent employee, and he said that he "enjoyed the work environment and *liked the people*." Tr. 94 (emphasis added). This is Plaintiff's last VR report, as the employer hired him.

---

[20] Of note, the writer indicated that there had been "no alcohol-related incidents." Tr. 95.

29

Interestingly, working seems to *benefit* Plaintiff's mental well-being.  <u>See</u> Tr. 196 (mood "improved" after finding work).  Plaintiff saw Dr. Jackson the day after the December VR report was written.  <u>See</u> Tr. 192.  He told the doctor that he had no problem with energy, motivation, or irritability, and believed that working played "a big role."  <u>Id.</u>  Dr. Jackson remarked that Plaintiff had been drinking less since he started working and his mood had improved.  When seeing the doctor the following March, Plaintiff said that he felt "comfortable" on the job, and that his mood had been "pretty good."  Tr. 191.  In sum, Plaintiff fails to show that he is unable to work because of an inability to interact with others.

Plaintiff adds that, even if he could perform SRRTs, he cannot maintain the concentration to do so, again returning to Dr. Jackson's opinion.  But again, the ALJ did not find support for this opinion in the record, and particularly not in Dr. Jackson's records.  Others observed no problems with Plaintiff's ability to concentrate, <u>see, e.g.</u>, Tr. 134, and even Dr. Braxton opined that Plaintiff would be able to sustain concentration as required to work, Tr. 212.  Dr. Jackson's only comment on Plaintiff's concentration was that he had no problem.  Tr. 194.  It would seem, if Plaintiff indeed experienced *constant* "[d]eficiencies of concentration," Tr. 308, that the doctor would have so noted and not have recommended Plaintiff for job placement, even reservedly, <u>see</u> Tr. 180.  Accordingly, Plaintiff's argument has no merit.

30

4. Credibility

Last of all, Plaintiff argues that the ALJ erred in how he conducted the credibility assessment, finding Plaintiff "not entirely credible." Tr. 20. In <u>Hines</u>, the Fourth Circuit Court of Appeals set out its standard governing the assessment of subjective complaints:

> Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

453 F.3d at 564-65 (quoting SSR 90-1p, 55 Fed. Reg. 31898-02) (emphasis omitted). The court added that Social Security Ruling 96-7p, Section 416.929(c)(1) and (c)(2), <u>Hunter v. Sullivan</u>, 993 F.2d 31, 36 (4th Cir.1992), and other successors to Ruling 90-1p "establish a two step process that comports with applicable Fourth Circuit precedent." <u>Hines</u>, 453 F.3d at 565. As set forth in <u>Hunter</u>, the two-step process "requires an adjudicator to consider subjective testimony . . . if a 'physical or mental impairment that could reasonably be expected to cause pain is shown by

medically acceptable objective evidence.'"  993 F.2d at 36 (quoting SSR 90-1p, 55 Fed. Reg. at 31899).

Plaintiff urges that, once the ALJ found that he had such a mental impairment, Plaintiff's testimony regarding his subjective complaints was "entitled to great weight." Pl.'s Br. at 14.  Because the ALJ did not accord his testimony great weight, Plaintiff contends he committed legal error.

The first problem with this argument is that it would render the second of the two steps – evaluation of the claimant's statements – void, and such a construction is prohibited.  See, e.g., PSINet, Inc. v. Chapman, 362 F.3d 227, 232 (4th Cir. 2004) ("General principles of statutory construction require a court to construe all parts to have meaning[.]"); United States v. Snider, 502 F.2d 645, 652 (4th Cir. 1974) ("[A]ll parts of the statute must be read together, [not] interpreting one part so as to render another meaningless[.]"  (citation omitted)).  Plaintiff comes to his legal argument by tracing the holding of a 1993 Third Circuit[21] case – which does not require a two-step process – back to its roots in a 1974 Fourth Circuit case.  But even the Third Circuit's more recent cases apparently rely on the same guidelines that presently serve this court:  Section 416.929, Ruling 96-7p, and its case of Hartranft v. Apfel, 181 F.3d 358 (3d Cir. 1999).  See, e.g., Prokopick v. Comm'r of Soc. Sec., No. 07-1553, 2008 WL 901972, at *3 (3d Cir. April 4, 2008).

---

[21]  The Third Circuit is apparently the only one which was ever ruled by this standard.

32

Hartranft held, in part, that "[o]nce an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, . . . the ALJ [must] determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id. at 362. In this more recent Third Circuit ruling, an ALJ may reject a claimant's subjective testimony as long as he or she provides sufficient reasons for doing so. See Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999) (citations omitted). But even in cases which hold the ALJ to a "great weight" standard, there is the proviso that the statements be supported by "competent medical evidence," e.g., Taybron v. Harris, 667 F.2d 412, 415 n.6 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); see also Ferguson v. Schweiker 765 F.2d 31, 37 (3d Cir. 1985) ("when [subjective] complaints are supported by medical evidence, they should be given great weight"); or that they can be disregarded only if "there exists contrary medical evidence," Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993). In Plaintiff's case, the ALJ found that his records fail to support his claim that his mental symptoms were disabling. See Tr. 20.

Nevertheless, even prior to SSA's promulgation of its policy in Ruling 96-7p, the Third Circuit allowed an ALJ to reject a claim of disabling pain when he had "consider[ed] the subjective pain and specif[ied] his reasons for rejecting these claims and [had] support[ed] his conclusion with medical evidence in the record."

Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990). Prior to SSA's revision of its

pain standard, it temporarily revised 42 U.S.C. Section 423(a) to add:

> An individual's statement as to pain or other symptoms shall not alone
> be conclusive evidence of disability as defined in this section; there
> must be medical signs and findings, established by medically
> acceptable clinical or laboratory diagnostic techniques, which show the
> existence of a medical impairment that results from anatomical,
> physiological, or psychological abnormalities which could reasonably
> be expected to produce the pain or other symptoms alleged and which,
> when considered with all evidence required to be furnished under this
> paragraph (including statements of the individual or his physician as to
> the intensity and persistence of such pain or other symptoms which
> may reasonably be accepted as consistent with the medical signs and
> findings), would lead to a conclusion that the individual is under a
> disability. Objective medical evidence of pain or other symptoms
> established by medically acceptable clinical or laboratory techniques
> (for example, deteriorating nerve or muscle tissue) must be considered
> in reaching a conclusion as to whether the individual is under a
> disability.

Pub. L. 98-460, § 3(a)(1), reprinted in 130 Cong. Rec. at H9823 (daily ed. Sep. 19,

1984). This interim provision was to remain in effect pending the results of a study

concerning the evaluation of pain which had been commissioned by Congress. The

Third Circuit Court of Appeals held that this provision was consistent with its pain

standard that "subjective symptomology, such as pain, must be considered, and can

support a finding of disability," but that "subjective complaints of pain, without more,

do not in themselves constitute disability." Green v. Schweiker, 749 F.2d 1066, 1070

(3d Cir. 1984).

The Green plaintiff argued, in part, 749 F.2d at 1068, that the fact finders had

violated Third Circuit precedent which held that, where subjective pain complaints

34

"are supported by medical evidence, they should be given great weight," citing Taybron, 667 F.2d at 415 n.6 – a case also cited to by Plaintiff herein. The court acknowledged that it was "certainly reasonable" for plaintiff to interpret its guidelines to "suggest that in certain circumstances subjective pain alone may be a sufficient basis for benefits, particularly where the ALJ cites no contrary medical evidence," although none of its prior cases "directly" so held. Green, 749 F.2d at 1068. But it explained that, "while our prior decisions on evaluating subjective pain may be read expansively to contradict the [Commissioner]'s approach, they may also be read restrictively, so as not to contradict the [Commissioner]'s general approach." Id. at 1069.

Although the Act's "interim provision" was only to apply to disability determinations made prior to January 1, 1987, it "still appears in the statutory codification and decisions have continued to be rendered under it." Craig, 76 F.3d at 593. In the Fourth Circuit, Section 416.929 provides the authoritative standard for evaluating pain in disability determinations and further "incorporate[s] the standard set forth in section 423(d)(5)(A)." Craig, 76 F.3d at 593. This regulation emphasizes the importance of objective medical evidence:

> Objective medical evidence of this type is a useful indicator to assist [SSA] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work . . . . [SSA] must always attempt to obtain objective medical evidence and, when it is obtained, [SSA] will consider it in reaching a conclusion as to whether [the claimant is] disabled.

35

Section 416.929(c)(2).

Section 416.929 further states that SSA, in "evaluating the intensity and persistence" of symptoms, will "consider all of the available evidence," including medical history, signs and laboratory findings, medical opinions, *and* statements from the claimant and others about symptoms' affects. Section 416.929(c)(1). But then, in reaching the disability decision, SSA will consider the claimant's statements "about the intensity, persistence, and limiting effects" of symptoms and evaluate the statements "in relation to the objective medical evidence and other evidence." Section 416.929(c)(4). Specifically, SSA states:

> We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities . . . to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, *can reasonably be accepted as consistent with the objective medical evidence and other evidence.*

Id. (emphasis added).

There is no indication in Section 416.929 that the claimant's statements will be given any greater weight than "the objective medical evidence and other evidence"; indeed, it appears that, in a balancing of evidence, objective medical and other evidence is weighed more heavily, as the claimant's purported limitations need only be accepted to the extent that they are consistent therewith. Thus, the Craig

court explained that "objective medical evidence and other objective evidence" are *crucial* "to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work."  56 F.3d at 595.  Further,

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they need not be accepted to the extent they are inconsistent with the available evidence*, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]

Id.

There is another flaw in Plaintiff's attempt to base his legal argument in Fourth Circuit law.  Plaintiff traces the "great weight" phrase to the Fourth Circuit case of Combs v. Weinberger, 501 F.2d 1361 (4th Cir. 1974), but Combs, in turn, quotes Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962).  In Underwood, however, the phrase comes from the following passage:

> [E]xpert medical diagnostic opinion and evidence, alone, may not enable a fact finder properly to determine whether or not such limitation of capacity amounts to disability within the terms of the Act.  *Where it is not possible to reach a determination on such evidence* it then becomes necessary to consider subjective testimony to determine accurately the effect of these impairments upon the Claimant.  *Such evidence **may** be entitled to great weight on the matter of disability, especially where such evidence is uncontradicted in the record.*  Even where medical opinion is very strong in favor of disability, this subjective evidence will always be a significant source of corroboration.

298 F.2d at 852 (emphases added).  Therefore, even at its genesis, the standard upon which Plaintiff attempts to rely was conditional, and not mandatory.

Plaintiff next argues that the ALJ "ignored the various 'credibility tests' that [Plaintiff] passed." Pl.'s Br. at 14. Plaintiff "proves" his credibility by quoting Dr. Miller: "[Plaintiff] does not exaggerate or minimize symptoms. In fact, he was quite frank."[22] Tr. 153. Interestingly, Dr. Braxton also found Plaintiff to be "a reliable source of information," Tr. 210, yet the interviews differed markedly.

Plaintiff told Dr. Miller that he is only "mildly depressed," his problems are "primarily with anger," and "he is often in confrontations with people." Tr. 152. In his interview with Dr. Braxton, however, Plaintiff revealed a "long history of . . . poor interpersonal relations with family, friends, and coworkers"; a "history of multiple incarcerations"; and that his mind goes "blank" during "explosive events." Tr. 210. To Dr. Miller, Plaintiff explained that, "*when he is drinking,* he becomes quite angry and aggressive." Tr. 153-54.

Plaintiff told Dr. Miller that he was taking medication "for control of mood swings," Tr. 152 – presumably his ups and downs, as he had described to Dr. Jackson, see, e.g., Tr. 179 (mood fluctuations, "but no serious depression"); 182 (if he misses a dose, "he feels anxious");185 (a good mood "can suddenly turn to depression"); 252 (mood up and down); 304 (mood "pretty good," with no sustained depression). Yet Plaintiff told Dr. Braxton that he takes Effexor "to help with his explosive outbursts." Tr. 210.

---

[22] Plaintiff argues that his honesty is made "conspicuous" by his admission to Dr. Miller that he was drinking, Pl.'s Br. at 15, yet there is no reason to believe that Plaintiff knew that his substance abuse might preclude him from receiving benefits.

Plaintiff further told Dr. Miller that he lost his last job, in a "sheltered workshop," "either because he went in to rehab problem or because he simply put in focus secondary to alcohol use." Tr. 152. Plaintiff told Dr. Braxton that he lost his job because he "'couldn't get along with the lead person.'" Tr. 210. Plaintiff explained his lack of socializing to Dr. Miller by explaining that "he might get in to his old habits." Tr. 153. Also, perhaps because of his depression, he did not enjoy going out and meeting people. If Plaintiff did not "exaggerate or minimize symptoms" with Dr. Miller, these variations suggest that he *did* with Dr. Braxton and, accordingly, do not support his credibility while purportedly abstinent.

Moreover, although Plaintiff relies on Dr. Miller to support his credibility, this doctor diagnosed Plaintiff only with alcohol dependence; rule out cocaine dependence; and rule out cocaine abuse. Tr. 155. He concluded that Plaintiff was "able to understand, retain, and follow simple instructions, and to sustain attention in order to perform a simple, repetitive task" – unless he is drinking. Id. Further, Plaintiff "would have some difficulty relating to fellow workers and supervisors, *particularly when he drinks.* He may have some difficulty tolerating the stress and pressures associated with day to day work activity, *particularly when he drinks.*" Id. (emphases added). Arguably, the ALJ believed Plaintiff to the same extent as did Dr. Miller, as the ALJ found that Plaintiff "has a decreased ability to concentrate on and attend to work tasks to the extent that he can perform only [SRRTs] requiring minimal interaction with others." Tr. 17.

Plaintiff also argues that he was "fearlessly forthright with Dr. Jackson," admitting his relapses when they occurred.[23] Pl.'s Br. at 15. But it is not clear if Dr. Jackson was aware of the extent of Plaintiff's substance abuse, and the doctor's treatment records certainly do not reflect that he was. They contain no mention of Plaintiff's June 2003 hospitalization or Plaintiff's use of illicit drugs in 2003. Plaintiff's February 2004 hospital records reflect that he was abusing substances when he saw Dr. Jackson the previous month, see Tr. 133, and his July 2006 hospital records indicate the same for his visit that month, see Tr. 291. Importantly, there is no notation of Plaintiff's violent altercations when abusing substances, and no indication that Dr. Jackson linked the two. In May 2004, Plaintiff told Dr. Miller that he was drinking alcohol, Tr. 153; in August 2004, he told Dr. Jackson that he had been abstinent since February, Tr. 179. In December 2006, the doctor placed Plaintiff's cocaine abuse at "some years ago," Tr. 254, although Plaintiff unarguably had used in January 2005, see Tr. 177.

Nevertheless, Plaintiff had nothing to lose by such admissions to Dr. Jackson, where he may only have hindered his treatment. On the other hand, Plaintiff's admission to the ALJ of continued substance abuse, and the linking of his interpersonal difficulties to such abuse, clearly would threaten his disability case.

---

[23] It appears that Plaintiff only admitted his relapses *after* he had been hospitalized, see especially Tr. 184-85, and did not discuss drug use, see, e.g., Tr. 182, 186, 304.

Accordingly, the court finds that the ALJ committed no error in "missing" the "clear inferences" to be drawn by Plaintiff's examples.

**Conclusion and Recommendation**

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence, and the correct legal principles were applied.  Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **AFFIRMED**.  To this extent, Plaintiff's motion for summary judgment (docket no. 13) seeking a reversal of the Commissioner's decision should be **DENIED,** Defendant's motion for judgment on the pleadings (docket no. 15) should be **GRANTED**, and this action should be **DISMISSED** with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

October 29, 2009

41